IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| EMMETT J. FOLSOM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 04-4097-CV-C-ODS |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER AND OPINION REVERSING THE COMMISSIONER'S FINAL DECISION DENYING BENEFITS AND REMANDING FOR FURTHER PROCEEDINGS**

After reviewing the administrative record (including the ALJ's opinion) and the parties' briefs, the Court reverses the Commissioner's final decision denying Plaintiff's application for benefits and remands the matter to the Commissioner for further proceedings.

Plaintiff was in an automobile accident in September 1992 and suffered a compression fracture at L1. He underwent fusion at T10-L2 that included the insertion of rods; however, the rods became dislodged (apparently because they were not inserted properly) so they were removed in May 1994. Meanwhile, Plaintiff was awarded benefits in February 1993. The award was terminated when Plaintiff went to prison in 1996. This was Plaintiff's fourth incarceration; he has been to prison for crimes including forgery, burglary and auto theft. Plaintiff was released from prison in December 2000, and in May 2001 he filed the instant application for Supplemental Security Income.

In rejecting Plaintiff's claim, the ALJ considered Plaintiff's prior felony convictions as a factor bearing on his credibility. The Court does not quarrel with this decision; juries are instructed they may consider a witness' felony convictions in evaluating credibility, and the same principle should apply in an administrative proceeding. However, this

factor can only affect the claimant's credibility; it is not a valid factor for evaluating the credibility of the claimant's physicians or the validity of the claim *en toto*.

The ALJ discounted the opinion of Plaintiff's treating physician, Dr. Drew Smith, because "[f]ew if any of these actual treatment notes showed any signs of neurological deficits, for example, or muscle spasms, muscle weakness, or significantly limited range of motion. It seemed that Dr. Smith did little other than passively satisfy the claimant's requests for narcotic drug prescriptions whenever he asked for them." R. at 23-24. The Court is concerned that the ALJ seems to be substituting his medical expertise for that of Dr. Smith's. In addition, the Court notes one of the factors to be considered when evaluating the severity of a condition and the claimant's credibility is the nature of the treatment prescribed. A simple over-the-counter medication, for instance, is regarded as less indicative of a disabling condition than the need for narcotic painkillers – yet here, the ALJ seems to have turned this reasoning upside down. There is no "test" for pain, and a doctor's willingness to prescribe strong medication is generally regarded as a proxy for a medical determination of need. Finally, the Court observes that Dr. Smith's records reflect some evaluation of Plaintiff's back problems. E.g., R. at 420, 426-429. His other notes also reflect back spasms or tenderness; the records themselves do not clearly indicate whether these findings were based on examinations or Plaintiff's reports, but Dr. Smith's July 29, 2003, letter suggests the latter. R. at 482.[1] In 2003, Dr. Smith referred Plaintiff to a neurosurgeon at the University of Missouri Hospital, Dr. Michael Oh. Dr. Oh reported Plaintiff's's 1995 CT scan demonstrated "greater than 50% loss of height and kyphosis,"[2] which measured at greater than twenty degrees. Dr. Oh indicated the degree of curvature did not appear to have increased since 1995, but "the amount of kyphosis and loss of anterior column support certainly could lead to persistent

---

[1] Plaintiff contends Dr. Smith had access to and reviewed two MRI's, but the record does not clearly substantiate this point. This issue can be developed on remand.

[2] Kyphosis is an abnormal rearward curvature of the spine that often leads to or is indicative of having a hunchback.

2

pain syndrome." He further indicated Plaintiff's reported symptoms were consistent with the physical findings and ordered a new CT scan. R. at 490-91. Upon receiving the CT scan, Dr. Oh instructed Plaintiff to wear a brace and follow up in six months and twelve months, at which time the possibility of surgery was to be explored. R. at 463. The six month visit would have occurred between the hearing and the ALJ's decision; the twelve month visit would have occurred after both. The ALJ did not have the benefit of Dr. Oh's opinions following these visits (assuming they took place) before rendering a decision.[3]

The ALJ contrasted Dr. Smith's opinions with those of Dr. William Pierce, who was Plaintiff's prior treating physician and, according to the ALJ, refused to prescribe narcotic medication. The records do not support the ALJ's intimation that Dr. Pierce did not believe Plaintiff needed serious pain treatment. Dr. Pierce prescribed hydrocodone, which is a codeine-based medication. R. at 387, 390-91. In September 2001 Dr. Pierce explained that he was not willing to prescribe Oxycontin due to the drug's "negative press" and concerns about the potential for addiction; his decision was *not* based on a disbelief of Plaintiff's need for strong pain medication. R. at 389. In the latter part of 2001 Plaintiff went to a pain clinic, but at that time Dr. Pierce did not have a copy of the records from the clinic. R. at 388.

The ALJ also found Dr. Smith (and Dr. Margaret Harlan, a consulting psychologist) not credible because included among their reports were "pre-printed form questionnaires, submitted to them by the claimant's attorney, that include leading questions and similar come-ons." R. at 25 n.3. The Court does not believe these characterizations are accurate or fair. The forms are similar in content to forms promulgated and utilized by the Commissioner. Most importantly, any flaw in the forms justified no more than refusing to consider them; they should not have affected the ALJ's consideration of the doctors' other reports and records (except to the extent there were contradictions, which was not the issue cited by the ALJ).

---

[3]The ALJ found Dr. Oh "did not even see the claimant after March 2003." R. at 24. This is not clear from the record, and may even be somewhat misleading.

3

This is not to say there are not potential grounds for discounting the seriousness of Plaintiff's condition. For instance, he required a refill in May 2002 because "he lost his Percocet in the water, he was out fishing," R. at 425, but told the ALJ he could not handle fishing. R. at 43. Plaintiff told Dr. Oh that "his pain was well-controlled with medication." R. at 462, 492. Plaintiff's work history is sporadic at best, suggesting a lack of desire to work.

Finally, there are certain "gaps" in the record that are not addressed by either party. For instance, there is no indication as to Plaintiff's activities while in prison. This is significant because Plaintiff was adjudged disabled before he went to prison and adjudged not disabled after being released. Plaintiff's activities in prison may support or undercut this seeming contradiction.[4]

The records as a whole does not support the ALJ's findings. While the record could support the ALJ's ultimate conclusion, the Court's review is limited to reviewing what the ALJ actually decided, not what he could have decided. Consequently, the Commissioner's final decision must be reversed and the case remanded for reconsideration. On remand, the Commissioner shall:

1. Allow introduction of additional reports bearing on Plaintiff's condition during the relevant time period, including but not limited to reports from Dr. Oh, the pain clinic Plaintiff visited, and Dr. Lewis.

---

[4]As an aside, the Court does not understand why this case is not treated as a cessation case, which would require the Commissioner to face a higher burden. Analytically, this makes sense: benefits were stopped for valid policy reasons as embodied in statutes. There has never been a determination that Plaintiff's condition improved or changed and there is no reason to think that Plaintiff's incarceration made him less disabled.

It may be that Congress has dictated that incarcerated recipients re-apply from scratch upon release from custody; the Court simply does not know. However, barring such a mandate, the Commissioner's prior determination is at least some evidence worthy of consideration and may even justify treating this matter similar to an attempted termination of benefits. This is also a matter that can be explored on remand.

Case 2:04-cv-04097-ODS   Document 14   Filed 04/26/05   Page 4 of 5

2. Reevaluate the opinions of Plaintiff's doctors, paying proper deference to treating physicians and specialists.

3. Reevaluate Plaintiff's credibility in light of all factors the ALJ finds relevant, including but not limited to any medical evidence supporting Plaintiff's testimony.

IT IS SO ORDERED.

                                        /s/ Ortrie D. Smith
                                        ORTRIE D. SMITH, JUDGE
DATE: April 26, 2005                UNITED STATES DISTRICT COURT